O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDIA ESTHER B., | Case No. 2:19-cv-09649-KES |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

## I.

## PROCEDURAL BACKGROUND

In January 2015, Plaintiff Claudia Esther B. ("Plaintiff") applied for social security disability insurance benefits ("DIB") alleging an onset date of June 8, 2011, with a last date insured ("LDI") of December 31, 2016.  Administrative Record ("AR") 17, 375.  The application was approved for a closed period of disability from June 8, 2011 through May 31, 2014, and Plaintiff received DIB for that closed period.  AR 192, 199-201. Plaintiff appealed, arguing that her disability persisted after May 2014, and requested a hearing with an Administrative Law Judge ("ALJ").  AR 202-03.

Three hearings were conducted on May 22, 2017 (AR 145-76), February 22, 2018 (AR 77-144), and July 19, 2018 (AR 53-76).  Plaintiff, who was represented by counsel, testified along with a vocational expert ("VE").  On September 14, 2018, the ALJ issued an unfavorable decision.  AR 15-45.

The ALJ found that Plaintiff suffered from the following severe medically determinable impairments:  "status post right shoulder decompression; status-post right de Quervain's release;[1] status post right carpal tunnel (CT) release; degenerative disc disease of the thoracic spine; headaches; obesity; depression, anxiety and somatic symptom disorders."  AR 17.

Despite these impairments, the ALJ found that through her LDI, Plaintiff had the residual functional capacity ("RFC") to perform light work with additional limitations on overhead reaching, fine and gross manipulation, and postural activities.  AR 29.  To accommodate Plaintiff's mental impairments, the ALJ limited her to "simple, routine tasks and simple work-related decisions.  She can occasionally manage changes in the work setting and occasionally do decision-making."  AR 29-30.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could no longer perform her past relevant work as a bank customer service representative, business trainer, or project coordinator.  AR 43.  Plaintiff could, however, perform the jobs of advertising material distributor (Dictionary of Occupational Titles ["DOT"] 230.687-010), automatic car wash attendant (DOT 915.667-010), routing clerk (DOT 222.687-022), and ticket taker (DOT 344.667-

---

[1] De Quervain's release is "an outpatient procedure that … releases the tendon sheath that wraps around the base of the thumb, relieving pressure and friction [and] … allows the tendons to glide freely when moving the thumb and wrist."  <u>See</u> <https://www.emoryhealthcare.org/orthopedics/dequervains-release-surgery.html> (last visited Oct. 23, 2020).

010) (collectively, the "Alternative Jobs").  AR 44.  The ALJ therefore concluded that Plaintiff was not disabled.  AR 45.

## II.

## ISSUES PRESENTED

Issue One:  Whether the ALJ erred in evaluating the opinions of psychiatrist Dr. Shamie and neurologist Dr. Merman.

Issue Two:  Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.

Issue Three:  Whether the ALJ erred in evaluating the lay testimony of Plaintiff's brother, Luis B.

Issue Four:  Whether the ALJ erred in determining Plaintiff's RFC.

(Dkt. 26, Joint Stipulation ["JS"] at 3-4.)

## III.

## DISCUSSION

**A.    ISSUE ONE:  Medical Opinion Evidence.**

**1.    Dr. Shamie.**

a.    Summary of Mental Health Treating Records and Opinions.

After graduating from college, Plaintiff worked at Bank of America for about fourteen years in different roles.  AR 87-89, 380.  After June 2010, Plaintiff developed a poor relationship with a supervisor whom she believed assigned "busywork" and "nitpicked" the results.  AR 1816-17.  By the end of 2010, Plaintiff "became quite ill with headaches" from stress, but she tried to continue working while taking some time off.  AR 94, 1817-18.  After working in that fashion for four or five months and receiving performance warnings in spring 2011, she was hospitalized for a work-related stress attack.  AR 94, 516.  She told management that she would file a workers' compensation claim and a claim for

"harassment" against her supervisor.[2]  AR 517.  She was subsequently fired.  AR 94, 517, 1818-19.

Plaintiff's workers' compensation doctor referred her for a psychiatric evaluation by Dr. Shamie.  AR 517.  Plaintiff began treating with Dr. Shamie on August 8, 2011.  AR 512.  She continued to see Dr. Shamie until 2016.  AR 512-670, 685-703, 1436-1528, 1729-44.  He administered various psychological tests, recorded her subjective complaints and his own observations, and prescribed and adjusted multiple medications to address Plaintiff's depressive symptoms.  He also assigned Global Assessment of Functioning ("GAF") scores over time, as follows:

| Date | GAF Score | AR |
| --- | --- | --- |
| 9/30/11 | 42 | 530 |
| 11/17/11 | 40-45 | 555 |
| 3/6/12 | 40-45 | 550 |
| 5/16/12 | 40-45 | 544 |
| 12/5/12 | 45-50 | 547 |
| 1/21/13 | 45-50 | 541 |
| 8/19/13 | 51-61 | 625 |
| 11/1/13 | 51-61 | 619 |
| 11/16/13 | 42 | 608-09 |
| 2/17/14 | 51-61 | 628 |
| 4/7/14 | 51-61 | 689 |
| 5/19/14 | 50 | 686 |
| 5/4/15 | 50 | 1453 |
| 6/12/15 | 51, could reach 61-70 with treatment | 1449 |
| 8/7/15 | 45 | 1485 |
| 7/11/16 | No GAF | 1438 |

[2] Plaintiff had filed an earlier workers' compensation claim against Bank of America in 2007 alleging injuries to her right shoulder and wrist.  AR 1502.  In 2008, she had surgery on her right shoulder and had a second surgery later.  AR 61-62, 63, 100.

As this chart shows, Dr. Shamie assessed Plaintiff's GAF as stable from September 2011 through May 2012; improving by December 2012 and holding stable through January 2013; improving more by August 2013 and holding stable through November 2013; inexplicably dropping back down to the initial, pre-treatment rating just fifteen days later (while saying "My opinions in this case remain unchanged" [AR 608]); returning to the 51-61 range immediately thereafter; remaining at that high level through 2014 and 2015; and again inexplicably dropping nearly to the initial, pre-treatment rating (while saying a GAF of 45 represented maximum medical improvement [AR 1500].)

In August 2015, Dr. Shamie wrote a lengthy Maximum Medical Improvement ("MMI") report. AR 1470-1507. He assessed Plaintiff as suffering from severe depression and anxiety. He found that the "predominant causation of her psychiatric injury remains the alleged workplace mistreatment and harassment" from four years earlier in 2011. AR 1499. He opined that Plaintiff has "moderate to marked impairment in all eight work functions."[3] AR 1500. Dr. Shamie also evaluated Plaintiff according to the AMA Guides to Permanent Psychological Impairment, listing the following ratings:[4]

---

[3] The California Department of Industrial Relations developed the use of the "Eight Work Functions" to rate psychiatric impairment as an alternative to the GAF scores, which had been criticized for "its lack of standardization, its reliance on subjective information, its lack of validity and reliability, [and] its flawed attempt to generate a single score." <https://drmosk.com/rating-psychiatric-impairment/> (last visited Oct. 28, 2020). The Eight Work Functions include the ability to comprehend and follow instructions, perform simple and repetitive tasks, maintain a work pace, perform complex or varied tasks, relate to other people, influence other people, make decisions without immediate supervision, and accept and carry out responsibility. AR 1911-12. Dr. Shamie did not explain how he concluded that Plaintiff had a "moderate to marked" impairment in all Eight Work Functions.

[4] The AMA Guides "focus on providing impairment ratings, using a five-point severity scale, in four areas of functioning." <https://drmosk.com/rating-

| Functional Area | Impairment Rating | AR |
|---|---|---|
| Activities of Daily Living | Marked | 1501 |
| Cognition | Moderate | 1501 |
| Socialization | Marked | 1501 |
| Accommodation and Perseverance | Marked | 1501 |

In addition to Dr. Shamie, the administrative record contains opinions from other medical sources about Plaintiff's mental health, as follows:

• July 2015:  Consultative examiner Dr. Monika Chaudhry examined Plaintiff, performed objective testing, and provided a detailed narrative report.  AR 1318-24.  Dr. Chaudhry opined that Plaintiff had only a "mild" mental impairment overall.  AR 1323-24.  Functionally, Dr. Chaudhry opined that Plaintiff had no limitation in her ability to perform simple tasks and was only mildly impaired in her ability to perform complex tasks.  AR 1323.

• August 2015:  State agency consultant Stephan Drake, Ph.D., found that after June 1, 2014, Plaintiff's mental disorders were non-severe.  AR 183.  He opined that they caused only "mild" restrictions on her daily activities and social functioning and "moderate" difficulties maintaining concentration, persistence, or pace.  AR 184.

• June 2016:  About a year later, Plaintiff attended a workers' compensation independent qualified medical examination with David Glaser, M.D., and Keven McCullough, Ph.D.  AR 1799-1923.  They reviewed her medical records, examined Plaintiff, and administered diagnostic tests.  AR 1799-1923.  Ultimately, they opined that Plaintiff had "Very Slight Impairment on Eight Work Factors 1, 2, 5, 6, 7, and 8, and Slight Impairment," in the other two factors.  AR 1911.  They assessed a GAF score of 60.  AR 1913-14.  They specifically found that a GAF score below 50, like Dr. Shamie assessed in August 2015, would be "too low,"

psychiatric-impairment/> (last visited Oct. 28, 2020).

because there was "no evidence that the claimant would be unable to hold a job on a purely psychological basis." AR 1914, 1920. They went on to describe how the severity of Dr. Shamie's findings was supported neither by his reports nor their examination. AR 1919 (finding "gross inconsistency between [Plaintiff's] account of her injury with subsequent course of symptoms"). They discussed how Dr. Shamie reported that Plaintiff laid down each day "due to depressive withdrawal," but Plaintiff told them that she laid down daily "due to migraine headache." AR 1919. While Dr. Shamie attributed a reduction in her social interactions and libido to Plaintiff's depression, they found that these areas of Plaintiff's life had not significantly changed since years when she was working. Id.

• March 2018: The ALJ consulted with a medical expert, Fatin Nahi, M.D., who reviewed the entire medical record and provided responses to interrogatories regarding Plaintiff's mental impairment and functioning. AR 2092-96. Based upon his review of the record, Dr. Nahi opined that Plaintiff had no mental functional limitations. AR 2096.

b.      The ALJ's Evaluation of Dr. Shamie's Opinions.

The ALJ gave Dr. Shamie's extreme functional limitations opinions little weight. AR 26-27. The ALJ explained various ways in which Dr. Shamie's opinions, including the GAF score of 42 that he assigned in his 2015 MMI report, were inconsistent with the results of his own examinations. AR 26. The ALJ also found Dr. Shamie's opinions inconsistent with those of Drs. Glaser and McCullough and cited conclusions by those doctors that Dr. Shamie's opinions were extreme and unsupported. AR 27. The ALJ, however, gave "substantial" weight to Dr. Shamie's opinions that after treatment, Plaintiff's mental health improved to a GAF score of 51-61 by August 2013. AR 27-28.

c.      Analysis of Claimed Errors.

Plaintiff argues that inconsistency with Drs. Glaser and McCullough is not a legitimate reason to discount Dr. Shamie's opinions because (1) Dr. Shamie had a

longer treating relationship, and (2) doctors evaluating a patient's mental health at different times are bound to observe different functional limitations, because the symptoms of depression are cyclical.  (JS at 9, 11.)

Here, multiple independent medical sources (i.e., Drs. Chaudhry, Drake, Glaser, McCullough, and Nahi) all opined at different times that Plaintiff had only mild or no mental limitations.  That Dr. Shamie's opinions positing extreme limitations were inconsistent with all of these opinions, including those of Drs. Glaser and McCullough, cannot be explained merely by the cyclical nature of depression.  Notably, Dr. Shamie opined extreme limitations only one month after Dr. Chaudhry's examination indicating mild impairment (AR 1323-24) and only two months after Dr. Shamie's own GAF findings of 51 indicating only moderate impairment.[5]  AR 1449.

Dr. Shamie's opinions were also inconsistent with his own examination findings.  These included Plaintiff displaying a normal thinking process, only minor difficulties in recall, and only slight difficulty in test taking.  AR 26-27, 524-25, 1321-22.  This is inconsistent with Dr. Shamie's multiple ratings of "marked" mental limitations.  Even Drs. Glaser and McCullough thought that Dr. Shamie's opinions were not supported by his own reports and examinations.  AR 1919-22.  Substantial evidence, therefore, supports the ALJ's finding of inconsistency, and that inconsistency was a specific, legitimate reason to discount Dr. Shamie's MMI report opinions.

---

[5] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).  The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000).  A GAF score of 51-60 indicates "moderate symptoms," such as a flat affect or occasional panic attacks, or "moderate difficulty in social or occupational functioning."  Id. at 34.

1        **2.      Dr. Merman.**

2              a.      The ALJ's Evaluation of Dr. Merman's Opinions.

3        Dr. Merman, a neurologist, began treating Plaintiff on December 17, 2013.

4   AR 2030-36.  On August 19, 2015, Dr. Merman issued a permanent and stationary

5   report.  AR 1955-57.  The ALJ recites a large portion of Dr Merman's records as

6   well as his opinion that Plaintiff should be restricted from "undue emotional

7   distress on the job."  AR 38-39 (citing AR 1957).  Thereafter, the ALJ indicated

8   that the opinion of Dr. Merman was given "partial" weight because disability is

9   assessed differently for purposes of awarding workers' compensation, but that Dr.

10  Merman's restrictions were nevertheless incorporated into Plaintiff's RFC "e.g.

11  simple routine tasks etc."  AR 43.

12             b.      Analysis of Claimed Errors.

13       Plaintiff argues that the ALJ failed to give a specific, legitimate reason for

14  rejecting Dr Merman's opinions.  (JS at 17.)  Defendant counters that the ALJ did

15  not need to give such a reason, because the ALJ did not reject Dr. Merman's

16  opinions; "there is no conflict between the ALJ's residual functional capacity

17  findings and Dr. Merman's opinion."  (JS at 18.)  Plaintiff disputes that the ALJ

18  adequately accounted for Dr. Merman's opinions, arguing, "Yet, the ALJ failed to

19  account for any limitation regarding job stress."  (JS at 26.)

20       The ALJ incorporated some limitations in the RFC aimed at reducing job

21  stress.  The ALJ limited Plaintiff to work involving "simple, routine tasks and

22  simple work-related decisions" with only "occasional" changes in the work setting

23  and decision-making.  AR 29-30.  Plaintiff argues that these restrictions do not

24  adequately protect against "undue emotional distress," because unskilled,

25  monotonous jobs may still "require production quotas or pace to perform the

26  work."  (JS at 41.)

27       Notably, Plaintiff does not argue (let alone cite to evidence from the DOT)

28  that any of the Alternative Jobs have fast-paced production requirements or

9

otherwise would involve "undue emotional distress."  Other VEs have testified that they do not.  See, e.g., Carl D. v. Comm'r of Soc. Sec., No. 5:17-cv-01114 (TWD), 2019 U.S. Dist. LEXIS 38063, at *34 n.6, 2019 WL 1115704, at *12 n.6 (N.D.N.Y. Mar. 11, 2019) (upholding finding that claimant restricted from fast-paced work could be a ticket taker); Williams v. Colvin, No. 2:15-cv-312-FtM-38MRM, 2016 U.S. Dist. LEXIS 123661, at *24, 2016 WL 4751708, at *8-10 (M.D. Fla. Sep. 13, 2016) (same); Wade v. Berryhill, Civil Action No. 3:16-CV-1362-BH, 2017 U.S. Dist. LEXIS 154492, at *32, 2017 WL 4176940, at *10-11 (N.D. Tex. Sep. 21, 2017) (upholding finding that claimant restricted from fast-paced work could be a routing clerk).  The VE is this case testified that the jobs of car wash attendant, advertising material distributor, and routing clerk could all be performed by someone limited to a "low stress work environment."  AR 135-36.

Thus, while the Court is not persuaded that the ALJ was required to include in the RFC a restriction against fast-paced work to account for Dr. Merman's restriction against "undue emotional distress," any error in failing to do so was harmless.  See Francis v. Comm'r of Soc. Sec., No. 2:17-cv-1022, 2018 U.S. Dist. LEXIS 158619, at *13, 2018 WL 4442596, at *5 (S.D. Ohio Sep. 18, 2018) ("Finally, even if the ALJ erred in not specifically including the language 'limited fast paced production standards' in the RFC, such error would be harmless given that five of the six the jobs identified by the ALJ do not require fast-paced production standards.").  Even if Plaintiff's RFC restricted her to working in a "low stress work environment," substantial evidence (i.e., the VE's testimony at AR 135-36) would still support the ALJ's finding that Plaintiff can work as a car wash attendant (53,950 jobs nationally), advertising material distributor (48,859 jobs nationally), and routing clerk (41,336 jobs nationally).  AR 44.

**B.**      **ISSUE TWO:  Plaintiff's Subjective Symptom Testimony.**

      **1.**      **Rules Governing the Evaluation of Symptom Testimony.**

      The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited."  Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (citation omitted).  "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  Id. (citation omitted).  If the ALJ's assessment "is supported by substantial evidence in the record, [courts] may not engage in second-guessing."  Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).  The ALJ's reasoning does not have to organized or labeled in any particular way.  Instead, the court "properly considers the ALJ's decision as a whole."  James H. v. Berryhill, No. C18-5371, 2019 WL 330166, at *6, 2019 U.S. Dist. LEXIS 12582, at *16 (W.D. Wash. Jan. 25, 2019); see Lozano v. Comm'r of Soc. Sec., No. 2:18-CV-2164, 2019 WL 6310039, at *4 n.3, 2019 U.S. Dist. LEXIS 204576, at *12 n.3 (E.D. Cal. Nov. 25, 2019) ("It would be overly formalistic to equate 'specific and legitimate' with a requirement that the ALJ repeat every assertion made prior in the concluding paragraph.").  "As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion."  Magallanes v, Bowen, 881 F.2d 74, 755 (9th Cir. 1989).  Indeed, "[e]ven when an agency explains its decision with less than ideal clarity, we must uphold it if the agency's path may reasonably be discerned."  Molina v. Astrue, 674 F.3d 1104, 1121 (9th Cir. 2012) (citations omitted), superseded by regulation on other grounds.

**2.      Summary of the Parties' Arguments.**

Plaintiff argues that the ALJ erred, because the "ALJ found generally that the claimant's testimony was not credible, but failed to identify which testimony she found not credible and why."  (JS at 27.)  According to Plaintiff, "the ALJ discusses a large part of the record but fails to actually cite any testimony or evidence which contradicts Plaintiff's symptom testimony."  (JS at 28.)

Defendant counters that while the ALJ primarily discussed how Plaintiff's symptom allegations were inconsistent with the objective medical evidence (AR 18-43), the ALJ also found that Plaintiff's symptom allegations were inconsistent with her demonstrated abilities, including her ability to interact adequately with various unfamiliar physicians at her examinations (AR 20-21) and evidence of symptom exaggeration (AR 24).  (JS at 29.)

**3.      Analysis of the ALJ's Reasoning.**

       **a.      Symptom Exaggeration.**

The ALJ noted that when Plaintiff was evaluated by Drs. Glaser and McCullough in June 2016, they determined that on the MMPI-2 psychological test, Plaintiff "endorsed a considerable larger than average number of infrequent psychological and physical symptoms that is rarely described by individuals with genuine medical problems."  AR 24, citing AR 1824-25.  "Scores at these elevated levels suggest over-reporting or 'fake bad' profile although may be present in individuals with acute emotional turmoil and may reflect genuine psychological distress and difficulties."  AR 1824-25.

The doctors observed, "The over-reporting is viewed to be a function of her personality disorder and not dissimulation on her part."  AR 1901.  Plaintiff told them she believed that "she is psychologically capable of working" and that the predominant cause of her "work impediments" are headaches caused by light sensitivity and "cognitive word-finding problems."  AR 1901-02.  Plaintiff "attributed her word-finding problems to faulty concentration and memory as part

12

of her psychiatric reaction to reported workplace harassment." AR 1903. Regarding headaches or orthopedic pain, Plaintiff "showed no pain behavior during the lengthy evaluation." AR 1805. They concluded, "she likely amplified her subjective distress but not her psychiatric disability and this comports well with her credibility." AR 1902. In explaining why they diagnosed Plaintiff as suffering from a personality disorder, they stated, "The claimant's level of reported ongoing dysfunction despite years of psychiatric and psychological treatments signaled there is more than meets the eye. Being disabled … five years after stressful exposure (and not PTSD)[ ] does not make complete sense clinically, and personality variables are medically probably to account for the stasis." AR 1920. Ultimately, the report denies any "significant credibility concerns" regarding Plaintiff's account of her subjective symptoms. AR 1800.

The take-away from these opinions is that Plaintiff did exaggerate the symptoms caused by her mental illness but did so because of a personality disorder rather than any intent to be dishonest. Since the ALJ was required to focus on the accuracy of Plaintiff's symptom reporting regardless of her character or general credibility, see Social Security Ruling ("SSR") 16-3p, the ALJ did not err in citing the findings of Drs. Glaser and McCullough as a basis for discounting, in part, Plaintiff's subjective symptom testimony.

b.     Inconsistent with Demonstrated Abilities.

The ALJ summarized Plaintiff's testimony. AR 30-32. Among other things, the ALJ noted Plaintiff's testimony that her headache pain made it difficult for her to talk, pay attention, or "do anything." AR 30-31, citing AR 94-96. Plaintiff had very few days without disabling headaches, as few as three days per month. AR 99, 105. Except for those three or four good days per month, she could do "hardly anything." AR 118. Headache pain caused her to be nauseated "pretty much all the time." AR 104. No medicine had ever alleviated her pain to the point where

13

she had "a week free of headaches."[6]  AR 96.  She did not "still use a computer" because the screen triggered headaches.[7]  AR 101-02.  Plaintiff testified that she "cannot go outside because of the sun" which worsens her headaches.[8]  AR 34, citing AR 60.  But see AR 1811 ("Her mother bought her a puppy, … which she takes outside and feeds.")

Regarding the effect of her mental impairments on social interactions, Plaintiff testified that it was difficult for her to be around others because of mood swings and impatience.  AR 31, citing AR 99.  When she accompanied her mother shopping, she stayed in the car because "being around people … kind of stresses me out."  AR 120.  She was too mentally impaired to do simple tasks like cooking, because she would forget food on the stove and burn it.  AR 33, citing AR 58 (testifying that if she tried to make breakfast "it may take me three/four hours to finish it while I've burned the eggs or I forgot that the stove was on;" "I just completely forget that … I had the food … in the stove").

The ALJ, however, found that Plaintiff was only "mildly" limited in interacting with others and only "moderately" limited in understanding or concentrating.  AR 20-21.  The ALJ cited records from Dr. Shamie's initial psychiatric evaluation in September 2011 and Dr. Chaudhry's July 2015 consultative examination.  AR 20-21.  These reports included observations that

---

[6] In August 2015, Plaintiff told Dr. Shamie that she was receiving acupuncture.  AR 1497.  In July 2016, Plaintiff reported that she had completed six sessions of acupuncture and "had a week and a half without [headaches] and it was nice."  AR 1807.  It is unclear why Plaintiff did not continue with acupuncture.

[7] In August 2015, Plaintiff told Dr. Shamie that she was "currently completing a Project Management Certificate course though a UCLA extension campus."  AR 1503.  By February 2018, she had completed that course.  AR 87.

[8] See also AR 1452 ("The patient states that she is willing to work but is not able to be exposed to light.")

14

while Plaintiff exhibited symptoms of depression, she was able to understand the testing process, complete psychological tests, and engage appropriately with the evaluator.  Id.  Plaintiff also reported being able to drive and enjoying "good" relationships with her family.[9]  AR 21, citing AR 1320.

The ALJ's discussion of Plaintiff's extreme testimony about the functional limitations caused by her impairments, contrasted with the findings of medical sources with whom she interacted, provides a clear and convincing reason to discount her symptom testimony.

c.      Treatment Gaps.

The ALJ cited Plaintiff's lack of consistent treatment.  Regarding mental health, the ALJ wrote, "Notably, at the hearing held on May 22, 2017, the claimant testified she had not been to the psychiatric counseling center since July 2016 and has not been receiving any treatment for depression and anxiety."  AR 30.  If Plaintiff's depression and anxiety were as disabling as she claimed (e.g., she could not leave the car when shopping and required 3-4 hours to make breakfast), then one would have expected her to pursue treatment more consistently.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may consider many factors in weighing a claimant's credibility, including … unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment").  While failure to get mental-health treatment is sometimes a result of mental impairments, see Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) ("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (citation omitted), there is no evidence that Plaintiff's impairments prevented her from seeking medical

---

[9] In July 2015, Plaintiff told Dr. Chaudhry that she was able to drive short distances.  AR 1320.  In April 2016, she reported that she "cannot drive."  AR 2059.  In July 2016, she reported, "I've not driven in five years."  AR 1811.

treatment when needed.  Indeed, she testified in February 2018 that regular treatment has a helpful impact on her depression, anxiety, and PTSD.  AR 110-11.

The ALJ also wrote, "Claimant also testified that she has not seen Dr. Brourman [her workers' compensation primary treating physician since 2012, per AR 832-33 and 871] since July 2015."  AR 30.  "In terms of her orthopedic issues, the claimant was not receiving any treatment, but was seeing the pain management doctor [Dr. Rosen]."  AR 31, citing AR 106-08, 110.  Plaintiff testified that she was unwilling to use her substantial workers' compensation treatment to pay for treatment.  AR 107.  The ALJ reasonably found that this suggests that Plaintiff's orthopedic issues are not as disabling as she contends.  AR 30-32.

d.      Inconsistent Symptom Reporting.

The ALJ noted medical records in which Plaintiff reported some relief from headache pain due to medication and no side effects.  AR 39-41.  The ALJ cited multiple records from Dr. Merman, as follows:[10]

• AR 2022 (June 2014):  She "is taking her Sumavel [generic sumatriptan] subcutaneous injections which helps a lot for headaches but only can get about 12. …  She has tried nortriptyline in the past which has helped a lot."

• AR 2019-20 (February 2015):  "Sumatriptan does get rid of her headaches pretty much."  "The patient apparently is taking six Excedrin a day.  This could be causing a rebound headache.  I am going to continue her on her nortriptyline."

• AR 2015 (May 2015):  Plaintiff "ran out of her nortriptyline."  Her dosage was increased to 60 mg.  AR 2017.

• AR 1472 and 1496 (August 2015):  "Cymbalta … has also been helpful in reducing the intensity levels of her pain.  …  She … still experiences headaches on

_____

[10] The ALJ cited to Dr. Merman records at AR 1470, 1496, 1946-47, 1955-57, 1960-61, 1964, and 1974-80.  See AR 39-41.  The Court includes other records by Dr. Merman to provide chronological context.

a daily basis, that are often severe and is controlled infrequently with medication ….."  That same month, Dr. Merman opined that "[s]ubjective complaints of [Plaintiff's] headaches should be rated as occasional and slight increasing to moderate with increasing emotional stress."  AR 2012.  He decided "to continue her on her nortriptyline." AR 2013.

• AR 1946-47 (June 2016):  Plaintiff reported "daily constant headache, but the nortriptyline is 'elixir' it helps her a lot."  Dr. Merman increased her dosage to 75 mg.

• AR 1942-43 (August 2016):  "She takes Imitrex 12 shots in a month which relieves her headaches usually only one shot will reduce her headache."  The "only thing that seems to be work on her is her nortriptyline 75 mg.  I am going to increase it to 100 mg at night."

• AR 1940 (November 2016):  "The patient is on nortriptyline 60 mg and can increase it to 75 mg.  She apparently has not gotten her medication for a couple of months."

• AR 1935-36 (February 2017):  "I am going to increase her nortriptyline to 100 mg and see how she does."

• AR 1932-33 (April 2017):  "Last week, she had daily headaches 'could not get out of bed.'  …  Nortriptyline helps with her headache."  Dr. Merman repeated, "I am going to also increase her nortriptyline to 100 mg at night."

• AR 1925-26 (June 2017):  Plaintiff "is not any better" but she "did get some benefit from nortriptyline."

Meanwhile, in April 2016, Plaintiff told pain management specialist Dr. Rosen that her pain was unchanged since November 2015.  AR 2059.  She denied any medication side effects and reported that medication decreased her pain to 2-4/10.  Id.  He opined that she was "doing well with her current medication regimen."  AR 2062.

In November 2016, Plaintiff told Dr. Rosen that she was "taking oral medications on an as-needed basis with no reported side effects. She rates her pain at 9/10 without medications and 6/10 with medications. … She reports improved activities of daily living such as cleaning and doing laundry." AR 2046. She also reported "that occipital blocks help significantly with her headaches. Tramadol decreased her pain levels by 60% for more than six weeks." AR 2049.

The ALJ contrasted this with Plaintiff's testimony that she suffers from serious medication side effects. AR 31, 40,citing AR 103-04 (side effects include difficulty walking straight, dizziness, drowsiness, and vomiting blood). The ALJ also contrasted these records with Plaintiff's testimony that medication does not help her headache pain. AR 31, 40, citing AR 96. The ALJ's finding of inconsistent symptom reporting is supported by substantial evidence and provides another clear, convincing reason to discount, in part, Plaintiff's subjective symptom testimony.

e.      Inconsistent with Objective Evidence.

The ALJ found that while Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision pursuant to the relevant factor under SSR 16-3p." AR 34. SSR 16-3p provides guidance for evaluating subjective symptom testimony. It directs ALJs to consider whether a claimant's claims of functional limitations due to pain are consistent with the objective medical evidence, the claimant's statements to other sources, and statements from medical sources or others who have observed the claimant. ALJs should also consider the claimant's daily activities, what treatment the claimant has received, and the effectiveness of medications, among other factors. SSR 16-3p, at § 2(d). The ALJ then summarized medical evidence under three headings corresponding to factors listed

1 in SSR 16-3p: (1) objective evidence, (2) treatment with medication, and (3) other

2 treatment.  AR 34-43.

3       Regarding objective evidence, the ALJ pointed out that Plaintiff had

4 undergone multiple tests to try to identify an organic abnormality (like a tumor)

5 that might be causing her headaches, but the tests revealed none.  AR 34.  While a

6 2013 MRI revealed a right torn rotator cuff, it was surgically repaired in January

7 2014 and examinations after that date did not reveal continuing impairment beyond

8 that reflected in the RFC.  AR 36-37, citing AR 872 (February 2015 report limiting

9 claimant only against "constant repetitive work at or above the shoulder level" and

10 "repetitive forceful griping, grasping, torqueing maneuvers" with her right arm).

11       While Plaintiff claimed that nerves in her hand had been surgically damaged

12 in January 2014, after which her right hand tingled and hurt, she often dropped

13 things, and she could not hold a pen for more than 15 minutes (AR 61-63, 100-01,

14 833), the ALJ cited to the February 2015 workers' compensation doctor's

15 conclusion that Plaintiff could use her right hand to work, so long as she avoided

16 "forceful" use.  AR 36-37, citing AR 870, 872.  The ALJ also noted the July 2015

17 consultative examination where Plaintiff's right-hand grip strength was largely

18 normal.  AR 39, citing AR 1313, 1315.  Similarly, a September 2015 orthopedic

19 medical reevaluation with respect to Plaintiff's right carpal tunnel release found

20 only occasional minimal pain, which can become intermittent or slight with

21 prolonged gripping, grasping, and torqueing maneuvers.  AR 37, citing AR 1765.

22       While Plaintiff testified that she could not walk straight and spent hours each

23 day in bed (AR 99, 103), the ALJ contrasted this testimony with findings from

24 physical examinations that showed a normal gait, normal range of motion in

25 Plaintiff's lower extremities, 5/5 motor strength, and no atrophy.  AR 38-40, citing

26 AR 1315, 1978.  Similarly, Plaintiff testified that she could not hold her head up

27 when suffering from a headache (AR 96), but the ALJ cited observations of

28 Plaintiff holding her head and neck in a "normal" manner.  AR 36, citing AR 870.

In sum, the ALJ offered clear and convincing reasons, supported by substantial evidence, for only partially crediting Plaintiff's subjective symptom testimony.

**C.   ISSUE THREE:  Lay Witness Statement.**

**1.     The ALJ's Evaluation of Luis B.'s Function Report.**

In June 2015, Plaintiff's brother, Luis B, completed a Function Report.  AR 388-96.  On February 23, 2018, Luis B. testified before the ALJ.  AR 122-31.  He testified that she had "[p]retty much daily" episodes of debilitating headache pain, and her condition got "worse and worse and worse" over time rather than improving.  AR 125-27.  The ALJ discussed Luis B.'s testimony at length.  AR 32-33.  The ALJ discounted his observations about Plaintiff's functional limitations for being "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision pursuant to the relevant factor under SSR 16-3p."  AR 34.

To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness.  Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

**2.     Analysis of Claimed Errors.**

First, Plaintiff argues that a lack of supporting medical records is not a "germane" reason for rejecting lay witness testimony, citing Diedrich v. Berryhill, 874 F.3d 634, 640 (9th Cir. 2017), and Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009).  (JS at 36.)  In Diedrich, the Ninth Circuit cited Bruce in holding that "a lack of support from the 'overall medical evidence' is … not a proper basis for disregarding" observations by a lay witness.  Diedrich, 874 F.3d at 640.  In Bruce, the Ninth Circuit held that the ALJ could not discredit a wife's testimony that her husband refused "to leave the bedroom, bathe, and eat because of his severe depression" simply because her testimony was "not supported by medical evidence."  Bruce, 557 F.3d at 1116.  Defendant counters that the ALJ found Luis

20

1  B's observations inconsistent with the medical evidence, which is different from

2  merely finding them unsupported, citing Bayliss v. Barnhart, 427 F.3d 1211, 1218

3  (9th Cir. 2005) (holding "[i]nconsistency with medical evidence" is a germane

4  reason for discrediting a lay witness's testimony).  (JS at 38.)

5      Other courts have wrestled with whether the Bruce line of cases and the

6  Bayliss line of cases create different rules for "inconsistent" type cases versus

7  "lack of support" cases.  See, e.g., Glover v. Astrue, 835 F. Supp. 2d 1003 (D. Or.

8  2011).  In Glover, the district court persuasively discussed changes to the

9  underlying regulations that eliminated the basis for the Bruce line of cases, leading

10  it to conclude, "The governing regulations make clear that lay testimony that

11  conflicts with or is inconsistent with the medical evidence may be rejected on that

12  basis …."  Id. at 1012.  This Court agrees with the Glover court's analysis.  See

13  also Brooks v. Saul, 776 F. App'x 487, 488 (9th Cir. 2019) (citing Bayliss in

14  holding that the "ALJ reasonably concluded that this lay witness report was

15  inconsistent with the medical evidence" and that was a "germane reason" to

16  discount the testimony); Miner v. Berryhill, 722 F. App'x 632, 634 (9th Cir. 2018)

17  ("[T]he ALJ's 'most important' reason for discounting Clark's testimony was that

18  the 'medical evidence does not support her statements.'  And this reason was alone

19  sufficient ….") (alterations omitted).

20      Plaintiff next argues that even if inconsistency with the medical evidence

21  can be a germane reason, the ALJ failed to identify any inconsistency.  (JS at 37,

22  40.)  Luis B.'s testimony, however, largely mirrored Plaintiff's, and the ALJ

23  adequately explained how Plaintiff's testimony was inconsistent with the medical

24  evidence, as discussed under Issue Two.  The ALJ, therefore, did not commit

25  prejudicial error in evaluating Luis B.'s testimony.  See Valentine v. Astrue, 574

26  F.3d 685, 694 (9th Cir. 2009) (holding that an ALJ's failure to address lay

27  testimony may be harmless where, as here, (a) the ALJ validly rejected the

28

claimant's subjective complaints and (b) the claimant's complaints were substantially the same as the lay testimony).

**D.      ISSUE FOUR:  The RFC Determination.**

Making an argument derivative of Issue One, Plaintiff contends that the ALJ erred by not restricting her from jobs that require production quotas or a fast-paced work to account for medical opinions that she avoid a high-stress work environment.  (JS at 41.)  As discussed earlier, the VE testified that a hypothetical worker restricted to "low stress" work could perform several of the Alternative Jobs.  AR 135.  The VE defined "low stress" as the absence of high-paced production quotas or demanding performance standards.  AR 137.  This renders harmless any error by the ALJ in failing to include in the RFC a limitation against "undue stress."

**V.**

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.


DATED:  October 29, 2020                      _____
                                                                KAREN E. SCOTT
                                                                United States Magistrate Judge